**Opinion issued April 8, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-24-00817-CV**

————————————

## IN THE INTEREST OF H.M.Q., A CHILD

———

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 01-24-00817-CV**

———

## MEMORANDUM OPINION

This appeal arises from a suit for the termination of parental rights. The trial court rendered a decree terminating the mother's and father's parental rights as to their one-year-old daughter, HMQ. Both parents appeal.

The mother and father each contend that the evidence is legally and factually insufficient to support the trial court's findings regarding the statutory predicate

grounds for termination of their parental rights as well as the trial court's finding that the termination of their parental rights is in HMQ's best interest. In addition, both parents challenge the trial court's appointment of the Texas Department of Family and Protective Services as the sole managing conservator of HMQ.

We hold that the evidence is legally and factually sufficient to support the portion of the trial court's decree terminating the mother's parental rights, but that the evidence is legally insufficient to support the lone statutory predicate ground on which the trial court relied in terminating the father's parental rights. Therefore, we affirm the trial court's termination decree as to the mother but not as to the father. Instead, we render judgment that the father's parental rights are not terminated and remand for the entry of an order either denying the Department's petition as to the termination of his rights or another order in HMQ's best interest.

Because we have affirmed the trial court's termination of the mother's parental rights, we further hold that she lacks standing to challenge the trial court's appointment of the Department as sole managing conservator. Because we reverse the termination of the father's parental rights, he has standing to challenge the Department's appointment. Nevertheless, we hold that the trial court did not abuse its discretion in appointing the Department as HMQ's sole managing conservator.

## BACKGROUND

The parties tried this suit to the bench over the course of two days in August and September of 2024. The Department put on two witnesses, the caseworker and the foster mother, and it also introduced about 1,000 pages of documents. The mother and father testified as well, as did several members of the mother's family.

*Circumstances Surrounding Removal*

HMQ was born in August 2023, and she was about one year old at trial. The Texas Department of Family and Protective Services took HMQ into its care days after she was born, and it placed her with a foster family shortly afterward. HMQ has since resided with the foster family. She has never been in her parents' care.

As explained in the affidavit of removal, during the last five months of her pregnancy, the mother repeatedly tested positive for drugs, including marijuana, amphetamine, and methamphetamine. The drug test administered to the mother about two weeks before HMQ's birth yielded a positive result for amphetamine use.

At birth, HMQ's urine tested positive for marijuana. Her meconium—first stool—tested positive for amphetamine. The mother's urine also tested positive for amphetamine at this time.

In addition to the mother's drug use, the parents left HMQ at the hospital and did not return for her. Neither one would respond to calls or messages from Department personnel. So, the Department took custody of the child.

*Mother's Initial Denial of Drug Use*

Initially, the mother denied using drugs while pregnant. She told the Department employee who signed the affidavit of removal that she had not used illegal drugs since before her pregnancy. The mother's medical records also stated that she generally denied drug use while pregnant. Notably, one record memorializing a visit about two weeks before HMQ's birth documented that the mother denied that she used drugs other than for medical reasons, was unable to stop using drugs, felt guilty about drug use, or had drug-related medical issues.

The mother also denied that the father used illegal drugs.

*Mother's History of Drug Use*

Eventually, the mother acknowledged she has a long history of drug use.

At trial, the mother testified that she first developed a drug problem in 2013, when she was 21 years old. As reported in her psychosocial assessment—an assessment the mother was required to undergo as part of this proceeding—she began using heroin "off and on" at this time. She completed a 30-day inpatient rehabilitation program in 2013 but relapsed a month later. She then completed another 30-day inpatient rehabilitation program but relapsed again two years later. In 2016, she completed a third inpatient rehabilitation program and was prescribed Suboxone—a drug used to manage addiction to opioids like heroin.

An August 2017 order of deferred adjudication was admitted into evidence. It shows that in 2016, the mother was placed on two years of community supervision for the state jail felony of possession of less than a gram of heroin. A subsequent charge for heroin possession was apparently dismissed.

The mother was incarcerated from September 2016 to January 2017. During this period, she participated in a substance abuse treatment program.

Medical records state that the mother's history of drug use includes several other drugs: amphetamine, methamphetamine, cocaine, and marijuana. These records are corroborated at least in part by the mother's positive drug test results during pregnancy. A hospital record created on the date of HMQ's birth states that outside records of urine test results show "positive for amphetamines, methamphetamines, and THC almost every month since last year." The same medical record reports that the mother eventually "admitted to continued use of meth and amphetamines" as well as occasional use of marijuana.

*Mother's Explanations for Some of Her Positive Drug Tests*

Despite having admitted to using drugs, the mother also offered explanations other than intentional drug use for some of her positive drug test results during her pregnancy. For example, in connection with her psychosocial assessment, the mother explained her positive test results for marijuana by stating, "I vaped while I

5

was pregnant, and it could have had marijuana in it." She also said that she was exposed to secondhand smoke by being near others smoking marijuana.

In addition, the mother suggested her positive test results for amphetamine were attributable to her use of the prescription drug Wellbutrin. A medical record does note that Wellbutrin may produce such false positives. But the same medical record contains the following notation attributed to her primary care physician: "Dr. Lai expressed concern about patient's active substance use, including recent positive [urine drug screen] within the last month for cocaine and methamphetamine. Dr. Lai does not believe positive methamphetamine results are due to Wellbutrin given that patient has not been picking up her RX based on his knowledge and has had numerous positive drug screens for methamphetamine during the past few months."

For her part, the mother characterized the hospital staff as "'harassing' her about her substance abuse history" in her psychosocial assessment.

*Mother's Family Service Plan*

Given her history of drug use and positive drug test results, the mother's family service plan required her to complete a substance abuse assessment and submit to random drug testing of her urine and hair. The plan required her initial test results to be negative or show consistently lower levels of drugs, and it required that her results be consistently negative by the end of the case.

*Mother's Random Drug Tests During the Case*

Throughout the pendency of this case, the mother's urine tested negative for the presence of drugs. Testing of her hair, however, was a different matter. In late February 2024, her hair tested positive for methamphetamine with a level of 3,247 pg/mg, and in mid-June 2024, it tested positive for methamphetamine again with an increased level of 3,541 pg/mg. It was not until mid-August 2024 that the mother's hair finally tested negative for drugs.

*Concerns About Mother's Drug Addiction*

Anna Doornik, the caseworker, testified that as of trial the mother had still not completed therapy for substance abuse. The mother still had about one third of the 90-day individual drug counseling program to complete. While Doornik acknowledged that the mother had recently submitted a negative hair sample, she noted that the mother was required to show continuous negative tests leading up to trial but had only one negative hair test shortly before trial. Notably, the mother had tested positive for methamphetamine just two months before trial. Doornik testified that her concern was not just about the mother's drug use but drug addiction. Given the mother's past struggles with addiction, Doornik was not reassured by the most recent test.

Nor was Doornik the only person to express concern in the record about the mother's ongoing drug addiction. The licensed professional counselor who

conducted the psychosocial assessment of the mother noted there were "concerns [the mother] seems to be minimizing her own substance abuse."

*Mother's Trial Testimony*

The mother conceded that hair samples she submitted for testing yielded positive results for drug use during the pendency of this case. But she attributed these test results to past drug use, maintaining she had only used drugs twice while this suit was pending, once near the outset of the case and a second time in January 2024. She said that after the second time, she stopped using drugs and has not used them since.

The mother testified that she did not believe her past drug use presently threatened HMQ's wellbeing. But she conceded that her use of methamphetamine had threatened her daughter's wellbeing when she was actually using the drug.

The mother had begun attending Narcotics Anonymous meetings, and she testified that she wanted the chance to prove she could remain sober. Yet she also testified that she had been "completely sober" since 2017 or so, except for "a couple uses of methamphetamine" after that timeframe.

The mother acknowledged she had not completed individual drug counseling, but testified that this was because she had difficulty finding an available provider.

*Father's History of Drug Use*

The father testified that he used methamphetamine for about a year before this case began and then stopped soon afterward. He gave conflicting testimony as to whether his methamphetamine use reflected addiction, but he generally denied that he had an addiction. He stated that he only used methamphetamine from time to time, rather than daily, and did not find it difficult to quit using it. He acknowledged that his year-long use of methamphetamine posed a threat to HMQ's wellbeing.

The father also acknowledged his past use of cocaine and marijuana.

*Father's Random Drug Tests During the Case*

The father took multiple random drugs tests during the pendency of this case. His urine samples were all negative for drug use. His hair samples in October 2023, January 2024, and February 2024 tested positive for methamphetamine use. Each time, however, the level of methamphetamine measured diminished—5,192 pg/mg, 3,319 pg/mg, and 2,983 pg/mg, respectively. The father's June 2024 hair sample tested negative for any drugs.

The father was successfully discharged from substance abuse counseling in June 2024. He had not tested positive for drugs again as of the time of trial.

Regarding the father's three positive hair tests for methamphetamine, Doornik, the caseworker, implicitly acknowledged that these results reflected past use. When asked whether it was "fair to say" the father had "not been using drugs

9

throughout the pendency of this case," Doornik agreed this was a fair statement. In short, the Department was not concerned that the father was still using drugs.

*Concerns as to Reunification of Father with HMQ*

Doornik testified that the father attended all visits with HMQ and these visits went well. When asked whether she agreed that the father had "put forth a valiant effort in this case to do everything that was asked of him," she replied, "I do." She agreed that the father could provide a safe and stable home for HMQ on his own.

The sole concern Doornik articulated at trial about the father was that he continued to reside with the mother. "That's the barrier" to reunification, she explained. Doornik had raised this concern before trial, texting him in late July 2024: "I want to discuss the possibility of family reunification with you alone and not [the mother]. As stated before, it's not impossible but difficult to achieve especially since you and [the mother] currently reside together. I want to know what your plan would be to protect [HMQ] from [the mother] while living with her."

Relatedly, the father accepted the mother's claim that she had been sober since January 2024 and testified that he thought it was in HMQ's best interest to come home to them. He thought that HMQ would be safe at home with the mother, but he also testified that he would "[s]tay away from her" if the mother returned to drugs.

10

*HMQ's Foster Placement*

Doornik testified that HMQ is doing "incredible" in her foster placement. The foster parents are meeting all of her physical and emotional needs, and HMQ is meeting all of her development milestones. HMQ has blossomed into "a fun and happy child." Though not yet approved as a foster-to-adopt home, Doornik testified that the foster parents wish to adopt HMQ if the parents' rights are terminated.

The foster mother similarly testified that HMQ is a sweet and healthy baby. She spends a lot of time "playing and cuddling and reading" with HMQ, and testified that HMQ has "bonded really well" with her and has a "great relationship" with her husband too. If it is possible to do so, they would like to adopt HMQ.

*Department's Grounds for Termination at the Close of Trial*

The Department asked the trial court to terminate the mother's rights on three grounds:

- engaging in conduct that endangered the physical or emotional wellbeing of HMQ;

- failing to comply with the provisions of the court-ordered family service plan; and

- using a controlled substance in a way that endangered HMQ's health and safety coupled with the failure to complete a court-ordered substance abuse treatment program or continued use of a controlled substance after the completion of such a program.

TEX. FAM. CODE § 161.001(b)(1)(E), (O), (P).

11

The Department asked the trial court to terminate the father's rights on a single ground: use of a controlled substance in a way that endangered HMQ's health and safety and failure to complete a court-ordered substance abuse treatment program or continued use of a controlled substance after the completion of such a program. *See id.* § 161.001(b)(1)(P).

*Trial Court's Decree*

The trial court found that termination of the mother's parental rights is warranted under section 161.001(b)(1)(E), (O), and (P) of the Family Code. It likewise found that termination of the father's parental rights is warranted under section 161.001(b)(1)(P) of the Family Code. The trial court further found the termination of both parents' rights to be in HMQ's best interest. *See id.* § 161.001(b)(2). It appointed the Department as sole managing conservator of HMQ, finding that the appointment of either parent as managing conservator would not be in HMQ's best interest because their appointment would significantly impair her physical health or emotional development. *See id.* § 153.131(a).

Both parents appeal.

**DISCUSSION**

In their primary issues on appeal, the mother and father challenge the legal and factual sufficiency of the evidence supporting the statutory grounds the trial court relied on to decree termination of their parental rights as well as the

best-interest finding. The parents also challenge the appointment of the Department as sole managing conservator.

We affirm the termination of rights as to the mother but reverse as to the father.

## Legal Standard for Terminating Parental Rights

A parent's rights to the care, custody, and management of his or her child are constitutionally protected. *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). But parental rights are not absolute; the Department may seek termination of the rights of those who are not fit to accept the responsibilities of parenthood. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The primary focus in a termination suit is protecting the child's best interest. *Id.*

To terminate parental rights under the Texas Family Code, the Department must establish that a parent committed one or more statutorily enumerated predicate acts or omissions and that termination is in the child's best interest. FAM. § 161.001(b)(1)–(2). The Department need only establish one of these statutorily enumerated predicate acts or omissions, along with the best-interest finding. *See id.*; *In re A.V.*, 113 S.W.3d at 362. But the Department must make these showings by clear and convincing evidence. FAM. § 161.001(b). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

13

The best-interest inquiry is separate and distinct from the one concerning the predicate grounds for termination of parental rights. *In re A.J.D.-J.*, 667 S.W.3d 813, 821 (Tex. App.—Houston [1st Dist.] 2023, no pet.). But evidence used to prove predicate grounds for termination may also be probative of a child's best interest. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Multiple nonexclusive factors bear on a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These nonexclusive factors include:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of those seeking custody;

- the programs available to assist them to promote the child's best interest;

- their plans for the child or the plans of the agency seeking custody;

- the stability of the home or proposed placement;

- the acts or omissions of the parent that may indicate the existing parent–child relationship is not proper; and

- any excuse for the parent's acts or omissions.

*Id.*; *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). These nonexclusive factors are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent–child relationship is in a child's best

interest on a particular record. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

In evaluating a child's best interest, we also may consider several factors set forth in section 263.307 of the Family Code. *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see* FAM. § 263.307(a)–(b) (stating that prompt placement of child in safe environment is presumed to be in child's best interest and enumerating 13 factors courts should consider in deciding whether child's parents are willing and able to provide child with safe environment).

**Legal and Factual Sufficiency Review in Termination Cases**

In this appeal, the primary issues are legal and factual sufficiency of the evidence. Due to the elevated burden of proof in a termination suit—clear and convincing evidence—we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also* FAM. § 101.007 (clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations").

In a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must otherwise assume the factfinder resolved disputed facts in the finding's favor. *In re A.C.*, 560 S.W.3d at 630–31; *see In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014) (reviewing court credits evidence supporting finding if reasonable factfinder could and disregards

contrary evidence unless reasonable factfinder could not). The evidence is legally insufficient if, viewing all the evidence in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *In re A.C.*, 560 S.W.3d at 631.

In a factual-sufficiency review in a termination case, we must weigh disputed evidence contrary to a finding against all the evidence in the finding's favor. *Id.* We consider whether the disputed evidence is such that a reasonable factfinder could not resolve the conflicting evidence in the finding's favor. *Id.* The evidence is factually insufficient if, in view of the entire record, the disputed evidence that a reasonable factfinder could not credit in the finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.*

In reviewing for evidentiary sufficiency, however, we must not usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether, and if so to what degree, to credit the evidence is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility. *Id.*; *In re J.S.*, 584 S.W.3d 622, 634 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**Analysis**

We first address the mother's appeal, and we affirm. We then turn to the father's, where we reverse. Finally, we address the managing conservator decision.

## I.     The Mother's Appeal

### A.     Statutory Predicate Grounds for Termination

The Department asserted three predicate grounds against the mother, including under section 161.001(b)(1)(E). When, as here, a parent challenges the sufficiency of the evidence to support a trial court's finding that termination is warranted under section 161.001(b)(1)(E), we review the evidence regarding this particular finding first due to its potential collateral consequences in future parental-termination proceedings. *See* FAM. § 161.001(b)(1)(M) (providing that parental rights may be terminated based on prior finding that parent's conduct violated section 161.001(b)(1)(D) or (E)); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (requiring review of findings made under section 161.001(b)(1)(D) or (E), when they are challenged on appeal, due to their collateral consequences in future cases). Thus, we begin our sufficiency review by evaluating the evidence as to this finding.

*Section 161.001(b)(1)(E) and Parental Drug Use*

Section 161.001(b)(1)(E) provides for the termination of parental rights when the parent has engaged in conduct, or knowingly placed the child with persons who

engaged in conduct, that endangers the child's physical or emotional wellbeing. FAM. § 161.001(b)(1)(E). It is well-settled under Texas law that evidence concerning a parent's drug use may support termination under section 161.001(b)(1)(E). *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (pattern of drug use accompanied by circumstances indicating related dangers to child, including risk to parenting ability, may show child endangerment).

*Mother's Drug Use While Pregnant*

Here, there is evidence the mother exposed HMQ to more than one drug in utero. At birth, HMQ's urine tested positive for marijuana; her stool tested positive for amphetamine.

It is settled Texas law that a mother's use of illegal drugs during pregnancy endangers the physical wellbeing of her unborn child. *In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) ("Drug use during pregnancy supports a finding of direct injury to the child."); *In re E.D.*, 682 S.W.3d 595, 608 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (holding in utero exposure to cocaine endangered child's wellbeing).

The mother tried to explain away her use of marijuana and amphetamine during pregnancy. But as the factfinder charged with evaluating the credibility of the witnesses, the trial court was free to find the mother's explanations unpersuasive.

For instance, while the mother attributed HMQ's positive stool test result to her use of the prescription drug Wellbutrin during pregnancy, a medical record notes

18

that her own physician doubted the veracity of this explanation because she was not filling her Wellbutrin prescriptions during this period of time. Her physician likewise noted that the mother's urine had tested positive for cocaine and methamphetamine, repeatedly so with respect to the methamphetamine, while pregnant with HMQ.

The trial court was not obliged to accept the mother's word over her physician's.

*Mother's Continued Drug Use During Pendency of Case*

Nor was the evidence of the mother's drug use confined to use during pregnancy. Accepting her account at face value, the mother testified that she did not become sober until January 2024. Thus, even after her drug use resulted in the removal of her newborn child in August 2023, she continued to use drugs afterward.

The trial court was entitled to give weight to the mother's continued use of drugs after her parental rights were in jeopardy because this circumstance may be reasonably understood—under settled Texas law—to indicate she chose drugs over being a mother to HMQ. *See, e.g.*, *In re A.J.D.-J.*, 667 S.W.3d at 825 (mother's continued drug use when she knew her rights were at stake indicated "inability or unwillingness to prioritize the burdens and responsibilities of parenthood ahead of the desire for intoxication").

*Mother's Minimization of Her Drug Use*

Moreover, the trial court sitting as factfinder could have reasonably found that the mother tried to minimize her drug use during the pendency of the case. She claimed to have used methamphetamine just twice in this timeframe and testified that both uses predated her sobriety in January 2024. She maintained that her February and June 2024 hair test results, both positive for methamphetamine, reflected past use and that, as her clean urine tests indicated, she was no longer using after January.

The mother's explanation has surface plausibility. It is not uncommon for urine and hair test results to differ, as they each measure use in different timeframes. *See In re N.S.M.*, No. 01-20-00764-CV, 2021 WL 1217328, at *6 (Tex. App.—Houston [1st Dist.] Apr. 1, 2021, pet. denied) ("It is not uncommon for a person to contemporaneously submit a urine sample that is clean and a hair sample that shows drug use due to the differing timeframe of use that each method of testing is capable of detecting."). Urine testing typically reveals use mere days beforehand, while hair testing reveals use remoter in time. *See In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *6 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. denied) ("Urine testing reveals current use of drugs—generally use within three days of the test—while hair testing reveals drug use that is remoter in time from the date of the test.").

But the mother's February and June 2024 hair tests showed increased rather than decreased levels of methamphetamine. Based on the increase in the level of methamphetamine detectable in the mother's hair over time, the trial court could have reasonably found that the mother was untruthful in claiming to have been sober since January 2024 and instead continued using methamphetamine afterward. *See, e.g.*, *In re J.A.O.*, No. 01-15-00885-CV, 2016 WL 1163058, at *3 (Tex. App.—Houston [1st Dist.] Mar. 24, 2016, no pet.) (record refuted mother's claim that positive test hair results for cocaine were "due to earlier drug usage" because quantity of cocaine "in the tests did not consistently decrease over this time"; quantity detected in one test "was higher than that detected two months earlier"); *In re R.E.T.R.*, No. 14-13-00640-CV, 2013 WL 6506689, at *5 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, no pet.) (indicating increase in cocaine level detected by hair tests over time was inconsistent with mother's claim that these positive test results were residual in nature reflecting past rather than present cocaine use).

*Mother's Lengthy History of Drug Use and Failed Rehabilitative Efforts*

The record shows the mother's history of drug use is lengthy and that she persisted in using drugs despite numerous rehabilitation attempts and in the face of serious legal consequences. The mother's use of hard drugs dates back more than a decade, when she first became addicted to heroin seriously enough to require multiple stints in rehab, as well as the prescription of a drug designed to treat opioid

addiction. Though she does not use heroin anymore, the mother switched to other hard drugs, like cocaine and methamphetamine, despite her prior experience with drug addiction and efforts at rehabilitation.

Mother's pattern of serious drug use over a lengthy period of time (despite multiple attempts to achieve sobriety and criminal proceedings for possession)—including her drug use while pregnant and after this proceeding began—is legally and factually sufficient to support the trial court's endangerment finding under section 161.001(b)(1)(E). *See, e.g.*, *In re A.J.D.-J.*, 667 S.W.3d at 826 (factfinder could reasonably find drug use implicated parental fitness, as evidence showed mother's drug use was ongoing and involved multiple drugs, including hard drugs like methamphetamine). Here, the mother's ongoing drug use resulted in the removal of HMQ at birth and has prevented the mother from caring for HMQ for the first year of her life when she was at her most vulnerable and required close supervision.

*Mother's Recent, Short-Term Sobriety Is Not Dispositive*

The mother emphasizes that her most recent hair test before trial in August 2024 was negative for drugs. But this single result does not negate her lengthy history of drug use, which spans both before and after HMQ's birth. *See In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (father's completion of treatment for substance abuse and single negative drug test did not negate his lengthy drug history). The trial court was under no obligation to conclude

22

that the mother had put her drug use behind her based on one negative hair test taken on the eve of trial. *See id.*

In this regard, we note that the trial court heard evidence from which it could have reasonably found that the mother's drug use is likely to recur and thus continues to pose a risk to HMQ's physical and emotional wellbeing. It was uncontradicted that the mother had not completed her individual drug counseling program as of trial. Given that her drug use was in large part responsible for HMQ's removal, the mother's failure to timely complete her counseling is one circumstance from which the trial court may have reasonably found the mother's ostensible recovery remained in doubt, despite her explanations for its noncompletion. Similarly, the mother characterized hospital staff as "harassing" her about her drug history. This characterization does not suggest she has come to terms with her drug addiction.

*Mother's Dishonesty and the Likelihood of Relapse*

Additionally, the trial court could have reasonably concluded that the mother was repeatedly dishonest about her drug use or its extent and seriousness. The mother's medical records show she denied a history of drug use. She initially denied using drugs while pregnant. Afterward, she denied continued use of methamphetamine during the pendency of this case, even though two hair tests months apart showed that its quantity increased over time. This too supports the trial court's section 161.001(b)(1)(E) finding, as the trial court could have reasonably

23

found that evidence of her dishonesty about her drug use makes "future endangerment more likely." *In re J.T.*, No. 01-19-00908-CV, 2020 WL 1942463, at *9 (Tex. App.—Houston [1st Dist.] Apr. 23, 2020, pet. denied).

*Mother's Drug Use Violated Section 161.001(b)(1)(E)*

In sum, we hold the evidence is legally and factually sufficient to support the trial court's finding that the mother engaged in conduct endangering HMQ's physical or emotional wellbeing under section 161.001(b)(1)(E) of the Family Code. Because one such statutory predicate finding suffices to support termination, we need not consider the trial court's additional findings under section 161.001(b)(1)(O) and (P). *See In re A.V.*, 113 S.W.3d at 362 (only one statutory predicate finding is necessary to support termination of parental rights).

## B.  Best-Interest Finding

In addition to the statutory predicate, the standard looks to the best interest of the child. Our court has held that an ongoing "pattern of illegal drug use" by a parent "implicates most of the *Holley* factors and will support a finding that termination of parental rights is in a child's best interest." *In re E.D.*, 682 S.W.3d at 607. So it is here. Without itemizing all the evidence of the mother's drug use, we note that:

- the mother used several drugs, including marijuana, amphetamine, and methamphetamine, while she was pregnant with HMQ;

- the mother's history of drug use includes hard drugs, like heroin, cocaine, and methamphetamine;

24

- the mother has more than once returned to using hard drugs despite multiple rehabilitative efforts in the past;

- the mother continued to test positive for methamphetamine while this case was pending, even though she knew her parental rights were at stake;

- the mother was not dissuaded from returning to drugs by past criminal drug charges, one of which involved months of incarceration; and

- the mother has lied about her ongoing drug use in an effort to conceal or minimize the extent of her drug addiction.

Under Texas law, these circumstances support the trial court's best-interest finding. *See id.* at 608–10 (concluding like circumstances allowed trial court to reasonably find mother's drug use was serious and supported its best-interest finding).

We acknowledge that the record is not entirely one-sided. Like the father, the mother has regularly visited HMQ during the pendency of the case and her conduct during these visits was appropriate. It does not appear to be disputed that the mother sincerely wishes to raise and care for HMQ going forward. Ultimately, however, this evidence does not change the analysis under Texas law because of the evidence of her drug use. *See id.* at 610–11 (drawing same conclusion based on like record).

We hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the mother's rights is in HMQ's best interest.

C.    **Appointment of Department as Conservator**

When, as here, we affirm a trial court's decree terminating a parent's rights, that parent lacks standing to challenge the trial court's appointment of a conservator. *In re J.D.G.*, 570 S.W.3d 839, 855–56 (Tex. App.—Houston [1st Dist.] 2018, pet.

denied). Hence, we lack jurisdiction to consider the mother's challenge to the trial court's appointment of the Department as HMQ's sole managing conservator. *Id.*

## II. Father's Appeal

Unlike as to the mother, reversal is required as to the father on this record: the statutory predicate ground for termination was not satisfied, as the Department concedes.

### A. Statutory Predicate Grounds for Termination

#### 1. Section 161.001(b)(1)(P)—the only ground found by the trial court

The trial court relied on a single statutory predicate ground for terminating the father's parental rights—specifically, section 161.001(b)(1)(P). This section provides for termination when a parent used a controlled substance in a way that endangered his or her child's health and safety *and* the parent either failed to complete a court-ordered substance abuse treatment program or continued to abuse a controlled substance after the completion of a court-ordered substance abuse treatment program. FAM. § 161.001(b)(1)(P).

On appeal, the Department concedes there is no evidence that the father failed to complete a court-ordered substance abuse treatment program or continued to abuse a controlled substance after completing such a program. This is correct. The father successfully completed substance abuse counseling in June 2024. Assuming this constitutes a court-ordered substance abuse treatment program, the record is

26

devoid of evidence that he continued to abuse a controlled substance afterward. Indeed, Doornik, the caseworker, testified that the father had not been using drugs during the pendency of this parental-termination proceeding.

Given this record, the evidence is legally insufficient to support the trial court's section 161.001(b)(1)(P) finding. And without this finding, the termination of the father's parental rights cannot stand. *See id.* § 161.001(b)(1) (requiring proof of at least one statutory predicate ground).

### 2. Section 161.001(b)(1)(E)—a ground not found by the trial court

The Department raises a cross-point of error, arguing the trial court erred by not finding that section 161.001(b)(1)(E) was a basis for terminating the father's parental rights. The Department pled this subsection as a basis for termination but did not ask for a finding on the subsection at the end of trial.

Although the Department acknowledges that it did not seek a finding on this basis below, the Department asks this Court to uphold the termination of the father's parental rights under this subsection. We decline to do so.

To begin, the Department's argument here is counter to precedent from the Supreme Court and this Court. Both Courts have been clear that appellate courts cannot affirm a trial court's termination of parental rights based on a statutory predicate ground the trial court did not include in its decree. *In re S.M.R.*, 434 S.W.3d 576, 581–82 (Tex. 2014) (agreeing that termination cannot be upheld on ground not

27

relied on by factfinder); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 250–52 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (sufficiency review limited to statutory grounds relied on by trial court).

The Department argues this caselaw does not address a situation where the evidence "conclusively" proves a pled-but-not-found basis for termination. Pointing to evidence concerning illegal drug use, the Department argues the record here conclusively establishes this statutory ground as to the father (*i.e.,* that he "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child").

Even assuming without deciding that the Department is correct about the legal framework, we conclude that the record does not *conclusively* establish section 161.001(b)(1)(E) in the father's case. The question here is not whether there was evidence on which the trial court *could have* found that section 161.001(b)(1)(E) was satisfied, but instead whether this predicate ground was established conclusively.

Evidence is conclusive "if reasonable people could not differ in their conclusions." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). When conflicts in the evidence exist or the resolution of a dispute turns on witness credibility, the evidence is not conclusive. *See, e.g.*, *In re S.M.R.*, 434 S.W.3d at 584–85 (rejecting contention that parent's non-compliance with family service plan

28

was conclusively proved because "questions of compliance and degree" were raised by the evidence).

The caselaw the Department directs us to shows that evidence of illegal drug use can support a trial court's finding to terminate parental rights under section 161.001(b)(1)(E)—not that evidence of drug use necessarily *requires* a finding under this section. *See, e.g.*, *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Our court has explained that illegal drug use *may support* termination under section 161.001(b)(1)(E) . . . .") (emphasis added). As the Supreme Court recently explained, "illegal drug use alone may not be sufficient to show endangerment," but "a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d at 278 (explaining that a "reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent'").

The evidence in this record does not conclusively show that the father engaged in conduct or knowingly placed HMQ with another who engaged in conduct that endangered HMQ's physical or emotional wellbeing. In its brief, even the Department notes underlying evidentiary conflicts that could only be resolved by a factfinder. *See In re R.J.*, 579 S.W.3d at 117 (trial court resolves evidentiary conflicts

in bench trial). The resolution of these inconsistences turns at least in part on an evaluation of the father's credibility, which is an issue for a factfinder. *See id.* (same regarding credibility assessments).

For example, the father testified he stopped using drugs when this case began. Evidence concerning his drug tests was consistent with this testimony; the factfinder could have reasonably concluded that he was being truthful. The evidence is conflicting as to whether he knew the mother was using drugs while pregnant (removal occurred promptly after birth). With respect to the mother's continued drug use, the father said he believed her claim that she had stopped using drugs. The father's testimony about the mother's discontinuation of drug use, for instance, is evidence that required evaluation by a factfinder, not least because it turns on his credibility. So too with the father's testimony that he would "stay away from" the mother if she returned to drugs.

Moreover, Doornik, the Department's caseworker, testified she did not believe the father had used drugs during the pendency of the case. The record contains evidence that Doornik was discussing the possibility of returning HMQ to his care alone mere weeks before trial. Doornik further testified that she believed that he was capable of providing HMQ with a safe and stable home on his own. Doornik's testimony as to his parental fitness is inconsistent with the Department's position that the record conclusively shows he is a danger to HMQ.

Due to these evidentiary conflicts and credibility issues, we cannot say that the record conclusively proves section 161.001(b)(1)(E). *See In re S.M.R.*, 434 S.W.3d at 584–85 (contemplating possibility that failure to comply with court-ordered family service plan could be established as matter of law, but rejecting this possibility in case at hand due to factual disputes). Because there is insufficient evidence to support the sole statutory ground on which termination of the father's rights were based, we reverse the parental termination ruling as to the father.

## B.     Best-Interest Finding

Because the evidence is legally insufficient to support the lone statutory predicate ground for terminating the father's parental rights that is recited in the trial court's decree, we need not consider whether the evidence is sufficient to support the trial court's finding that termination of his parental rights is in HMQ's best interest. *See, e.g.*, *Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (no need to consider sufficiency of evidence supporting best-interest finding once appellate court has concluded that trial court erred in terminating rights under applicable statutory predicate grounds).

## C.     Appointment of Department as Conservator

In addition to challenging the termination of his parental rights, the father separately challenges the trial court's decision to appoint the Department as sole managing conservator of HMQ. He argues the trial court abused its discretion.

### 1. Standard of Review and Applicable Law

If the trial court had appointed the Department as sole managing conservator solely as a consequence of having terminated both parents' rights, we would be required to reverse the conservatorship decision without further analysis. *See In re D.N.C.*, 252 S.W.3d 317, 318–19 (Tex. 2008) (when Department's appointment as conservator is solely a result of termination of rights and termination is reversed on appeal, appellate court must also reverse the conservatorship appointment).

But the trial court in this instance found that that appointment of either parent as managing conservator would not be in HMQ's best interest because their appointment would significantly impair the child's physical health or emotional development. When a trial court makes this finding apart from its termination decision, then the conservatorship decision is not premised solely on the termination of parental rights and does not rise or fall based on how the trial court's termination decision fares on appeal. *See In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007) (conservatorship decision is not subsumed in termination decision when former is based on finding that appointment of parent would significantly impair child's physical health or emotional development).

Instead, when the trial court makes this finding, its conservatorship decision is subject to separate review for abuse of discretion and the evidence need only preponderate in its favor. *Id.* at 615–17. A trial court generally does not abuse its

discretion in this context when its decision is based on conflicting evidence or some evidence of a substantive and probative character supports its conservatorship decision. *In re J.J.G.*, 540 S.W.3d 44, 61 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

## 2. Application of the Law to the Facts

We have overturned the trial court's determination that termination of the father's rights was supported under the ground sought by the Department; the record lacks evidence supporting that determination. But legal insufficiency of the evidence required to support termination of parental rights under section 161.001(b)(1) of the Family Code does not necessarily controvert the finding that appointment of the father as conservator is not in HMQ's best interest. *See In re J.A.J.*, 243 S.W.3d at 616 (evidence that is insufficient to support termination under section 161.001(b)(1) may be sufficient to support conservatorship decision due to differing nature of criteria governing these issues and differing burdens of proof).

Here, the record contains evidence that the father previously used methamphetamine and other drugs but stopped doing do shortly after this case began and has not used them again since. Doornik, the case worker, testified that she did not believe he had used drugs during the pendency of the parental-termination suit. The father completed all services required to secure the return of HMQ, and Doornik agreed with the proposition that he could provide HMQ with a safe, stable home.

33

But the dispositive question is not whether the record contains evidence that could support a conservatorship decision other than the one the trial court made. The question under Texas law is whether there is some evidence of a substantive and probative character that supports the trial court's decision. If so, then the trial court did not abuse its discretion in appointing the Department conservator, even if we might have made a different decision under the circumstances. *See In re J.J.G.*, 540 S.W.3d at 56 (so long evidence enables reasonable people to differ in their conclusions, reviewing court cannot substitute its judgment for factfinder).

Despite the favorable testimony noted above, Doornik also testified that the father continued to reside with the mother and this circumstance posed an obstacle to the reunification of HMQ with the father. In light of our affirmance of the trial court's finding that the mother endangered HMQ's physical or emotional wellbeing under section 161.001(b)(1)(E)'s more demanding evidentiary standard and the correspondingly elevated standard of review, Doornik's stated concern about the father and mother's continued cohabitation is well supported by the evidence (even if the evidence did not suffice to conclusively prove endangerment for purposes of termination). This, in turn, supports the trial court's finding that the appointment of the father as conservator is not in HMQ's best interest because it would significantly impair her physical health or emotional development due to his residency with the mother. *See* FAM. § 263.404(a)(1); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—

Houston [1st Dist.] 2012, no pet.) (evidence that paternal grandmother would allow parents to visit, despite their history of alcohol and drug abuse, supported trial court's appointment of Department as sole managing conservator in lieu of appointment of grandmother).

Consequently, the trial court made its conservatorship decision based on conflicting evidence and its decision is also supported by some evidence of substantive and probative character. The trial court therefore did not abuse its discretion in appointing the Department as HMQ's sole managing conservator.[1]

## CONCLUSION

We affirm the trial court's decree in part and reverse in part. We affirm the portions of the decree terminating the mother's parental rights and appointing the Department as HMQ' sole managing conservator.

But we reverse the portion of the decree terminating the father's parental rights; we instead render judgment that his rights are not terminated, and we remand this case to the trial court for further proceedings consistent with our opinion and judgment, including for the purpose of entering an order consistent with section 161.205 of the Texas Family Code disposing of the portion of the case relating to the father. *See* FAM. § 161.205 (when parent's rights are not terminated, trial court

---

[1]  As the Supreme Court has noted, the trial court retains jurisdiction to modify the conservatorship decision if it is in HMQ's best interest. *In re J.A.J.*, 243 S.W.3d at 617.

shall deny Department's petition or render any order in child's best interest); *Colbert v. Dep't of Family & Protective Servs.*, 227 S.W.3d 799, 816 (Tex. App.—Houston [1st Dist.] 2006) (appellate court is not in position to decide what relief is appropriate under section 161.205 and must remand this issue to trial court for further proceedings), *pet. denied sub nom. In re D.N.C.*, 252 S.W.3d 317 (Tex. 2008).


                                    Jennifer Caughey
                                    Justice

Panel consists of Justices Guerra, Caughey, and Morgan.